# Illinois Official Reports

## Appellate Court

***White v. Retirement Board of the Policemen's Annuity & Benefit Fund***,
2014 IL App (1st) 132315

| | |
|---|---|
| Appellate Court Caption | HARRIET DAVIS WHITE, Plaintiff-Appellee, v. THE RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-13-2315 |
| Filed | August 29, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from an order of the circuit court reversing a decision of the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago denying plaintiff's petition for prior service credit for her previous employment with the City of Chicago, the circuit court's order was affirmed, since plaintiff presented sufficient evidence to satisfy the requirements of section 5-214(c) of the Pension Code, she was entitled to the applicable pension service credit, and the cause was remanded to the Board for a determination of the amount of that credit. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CH-26791; the Hon. Neil Cohen, Judge, presiding. |
| Judgment | Affirmed and remanded with directions. |

Counsel on
Appeal

David R. Kugler, of the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago, of Chicago, for appellant.

Law Offices of Thomas J. Pleines, of Chicago, for appellee.

Panel

JUSTICE REYES delivered the judgment of the court, with opinion.
Justice Hall concurred in the judgment and opinion.
Justice Lampkin dissented, with opinion.

**OPINION**

¶ 1    Defendant, the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago (Board), appeals from the circuit court of Cook County's order reversing the Board's denial of plaintiff Harriet Davis White's (White) petition for prior service credit for her previous employment with the City of Chicago. On appeal, the Board argues the circuit court erred in reversing the Board's determination for two reasons: (1) the amended version of section 5-214(b) of the Illinois Pension Code (Pension Code) (40 ILCS 5/5-214(b) (West 2012)) retroactively applied to White's claim and, therefore, White could not receive pension service credit for her prior employment with the office of the corporation counsel; and (2) White's position as an administrative assistant II/police aide (police aide) for the City of Chicago police department did not qualify for prior service credit pursuant to section 5-214(c) of the Pension Code (40 ILCS 5/5-214(c) (West 2010)) because White's duties did not constitute "investigative work." For the reasons that follow, the judgment of the circuit court of Cook County is affirmed and the cause is remanded for further proceedings consistent with this opinion.

¶ 2                                    BACKGROUND
¶ 3    On February 17, 2010, White filed a petition with the Board seeking pension credit for two prior service periods with the City of Chicago under sections 5-214(b) and 5-214(c) of the Pension Code. As of the date of the petition, White had been a police officer with the Chicago police department since April 1998. Attached to White's petition were documents from the City of Chicago which verified White's employment history. The documents established that the first period of her employment with the City of Chicago was with the corporation counsel's office in the law department beginning on November 1, 1985, and ending on August 31, 1988, as a legal investigator. The second period of employment was as a police aide with the City of Chicago police department from March 16, 1992, until April 12, 1998.[1] As a police aide, White alleged her duties were to conduct investigations of criminal and noncriminal offenses,

_____

[1]We note that White was sworn in as a police officer in April 1998 and she does not assert on appeal that she was a police officer prior to that time.

to evaluate and classify the crime or ordinance violation, and to prepare written reports regarding those complaints. In addition, White asserted she conducted traffic accident investigations and prepared written reports for those investigations. White also stated she maintained and issued district vehicles and radio assignments, kept attendance and absence records, answered telephone inquiries, and assisted citizens with various city service requests.[2]

¶ 4 At the time White filed her petition for prior service credit, the relevant portions of section 5-214 of the Code provided:

"Any participant in this fund *** who has rendered service as a member of the police department of the city for a period of 3 years or more is entitled to credit for the various purposes of this Article for service rendered prior to becoming a member or subsequent thereto for the following periods:

***

(b) As a temporary police officer in the city or while serving *** in the office of the corporation counsel ***.

(c) While performing safety or investigative work for the county in which such city is principally located or for the State of Illinois or for the federal government, on leave of absence from the department of police, or while performing investigative work for the department as a civilian employee of the department." 40 ILCS 5/5-214 (West 2010).

¶ 5 On April 29, 2010, White appeared at the hearing on her petition for prior service credit *pro se*. The Board cautioned White that she may want to hire an attorney to represent her during the proceedings. Thereafter, White informed the Board that she intended to obtain counsel. The Board excused White without prejudice so she could obtain legal representation. The matter was continued generally. On February 12, 2012, an attorney filed an appearance on White's behalf and requested a hearing on White's pending petition.

¶ 6 On March 29, 2012, the Board conducted a hearing on White's petition. At the time of the hearing section 5-214(b) of the Pension Code had been amended (effective January 5, 2012) and stated any participant in the fund who has rendered service as a member of the police department of the city for a period of three years or more is entitled to prior service credit for the period:

"(b) As a temporary police officer in the city or while serving in the office of the mayor or in the office of the corporation counsel, as a member of the city council of the city, as an employee of the Policemen's Annuity and Benefit Fund created by this Article, as the head of an organization whose membership consists of members of the police department, the Public Vehicle License Commission and the board of election commissioners of the city, provided that, in each of these cases and for all periods specified in this item (b), including those beginning before the effective date of this amendatory Act of the 97th General Assembly, the police officer is on leave and continues to remain in sworn status, subject to the professional standards of the public employer or those terms established in statute." 40 ILCS 5/5-214(b) (West 2012).

Section 5-214(c) of the Pension Code remained unchanged.

_____

[2]The circuit court's June 26, 2013, order indicates there was another letter filed by White on February 2, 2010. That letter, however, is not included in the record on appeal.

- 3 -

¶ 7        Initially, the Board and White's counsel discussed the effect of the amendment of section 5-214(c) on White's claim for credit for her service with the office of the corporation counsel. White's attorney argued that the amended section did not apply to his client's claim because White's claim had been pending before the Board prior to the amendment. The Board did not render a determination at that time but stated it would consider the issue of which version of the statute applied to White's claim.

¶ 8        At the hearing, White testified that the reason she delayed pursuing the prior service credit was because "some things had happened in my life and I didn't come back, and I tried to find an attorney that I could afford. And when I did, I found my attorney here, but prior to that, I had some things happen in my life financially." Regarding her first period of employment with the office of the corporation counsel, White testified she was employed there from November 1985 until August 1988. Her duties included investigating torts and personal injuries as well as serving subpoenas.

¶ 9        Regarding her second period of employment as a police aide with the City of Chicago police department, White testified that she was assigned to the 22nd District police station and "assisted citizens as they came into the station and conducted investigations." All of the investigations occurred inside the police station, as the "citizens entered the station seeking police service or police help" while she sat at a desk, dressed in her police uniform. White testified she would listen to the citizen and then "formulate a detailed list of questions" in order to "help resolve [the] situation." For example, White would inquire as to whether the complaint was criminal or "noncriminal." White stated she would write a report and determine what type of crime occurred. If she determined a follow-up investigation was necessary, White would inform the detective division and explain the matter to them. White further testified that sometimes she would have to "give a flash message over the radio" in case it was "an action that's [*sic*] needed to be taken care of immediately." White stated she would write the initial report before the other police officers or detectives would be assigned to conduct a further investigation in order to complete the report.

¶ 10       White also provided testimony regarding specific reports she prepared. One incident involved an individual making a complaint to White about five or six dogs that were constantly barking. White testified she asked the individual a series of detailed, follow-up questions in order for her to determine how she was going to "handle the situation." White formulated questions about the dogs, and he responded that they were pit bulls and they looked malnourished. The answers to her questions led White to conclude that illegal dog fighting was occurring in that location. White testified she "conducted a follow-up investigation by initiating an information report, which is handled by the detective division." An illegal dog-fighting ring was discovered and "contraband" and "a couple of guns" were retrieved from that location.

¶ 11       The second incident White testified about involved a frightened and hysterical child. White asked the mother a series of questions which led her to believe there was something physically wrong with the child. Through her questioning, White discovered that the child had been acting afraid and nervous and had been complaining of pain.

¶ 12       At this point in White's testimony the Board stated, "I think we've heard enough to tell you the truth." White was, however, able to testify that she advised an ambulance be called to take the child to a hospital and that it was later determined the child had been sexually assaulted.

¶ 13       White's counsel then requested the Board consider an affidavit of Officer Richard Maxwell (Officer Maxwell) who worked with White at the 22nd District police station. The

affidavit set forth that Officer Maxwell was unable to attend the hearing because he was scheduled to work. Officer Maxwell's affidavit established he had personal knowledge of the duties performed by White from 1995 until she became a sworn police officer. Officer Maxwell averred that as a police aide, White's duties included conducting preliminary investigations and preparing confidential police reports. Officer Maxwell further stated that "a typical preliminary investigation would include interviewing the victims and witnesses of a criminal incident. *** Harriet would question the persons involved and, based upon their responses, formulated follow-up questions." Officer Maxwell also testified that part of White's duties consisted of conducting "name checks" of individuals who had been arrested for purposes of bringing the correct charges and determining bond. Officer Maxwell explained that "Harriet would have to gather additional information about the actual individual in custody to determine if he or she was wanted on a warrant for another charge." Lastly, Officer Maxwell averred that White conducted searches of female arrestees for "evidence of drugs, guns and other evidence of criminal activity." Officer Maxwell opined that the duties performed by White were investigative duties and that she qualified for prior service credit. The affidavit was signed and sworn by Officer Maxwell before a notary public on March 26, 2012.

¶ 14    The Board inquired as to why Maxwell was not present. White's counsel responded, "[a]s he says in his affidavit, he had to work today and couldn't be here." No witnesses testified in opposition to White's petition.

¶ 15    The Board then recessed into executive session. White's petition for prior service credit was put to a vote. Five members voted in favor of denying White's claim for prior service credit for her employment with the office of the corporation counsel and one member voted in favor of granting it. Regarding White's claim for prior service credit for her employment as a police aide, four members voted in favor of denying it and two members voted in favor of granting it. Accordingly, White's petition for prior service credit under sections 5-214(b) and 5-214(c) was denied.

¶ 16    In its April 30, 2012, written order the Board determined it would not consider the affidavit of Officer Maxwell, "as there was no showing made as to why the officer could not be present and be examined as to the affidavit made and his credibility." The Board also rejected White's argument that the previous version of section 5-214(b) applied to her application. The Board stated the April 2010 hearing was continued based on White's decision that she should obtain the services of an attorney and that White elected not to present her claim during the subsequent years. The Board also stated it is "required to follow the law in existence at the time of the hearing." Applying the amended version of section 5-214(b), the Board determined that White was not on a leave of absence while serving in the corporation counsel's office as required by section 5-214(b) as amended, and denied her claim for that period on that basis.

¶ 17    Regarding White's second period of employment as a public aide, the Board determined her position did not include "investigative work" as that term is used in 5-214(c). The Board noted that White did not conduct any follow-up investigations and that her job "is best described as informative, clerical, in obtaining information from citizens or officers and transmitting that information to others (detectives) for investigative work."

¶ 18    On July 16, 2012, White filed a petition for administrative review in the circuit court of Cook County. After the matter was fully briefed, the circuit court issued a written order reversing the Board's determination as to both periods of White's employment. First, the circuit court determined that the amended version of section 5-214(b) was inappropriately

applied retroactively to White's claim. Accordingly, the circuit court determined White was entitled to credit for her service at the office of the corporation counsel. Second, the circuit court determined that the Board's determination that White's position as a police aide did not qualify for service credit under section 5-214(c) was clearly erroneous as the evidence established White conducted "investigative work."

¶ 19   This appeal timely followed.

¶ 20                                    ANALYSIS

¶ 21   On appeal, the Board argues the circuit court erred in reversing the Board's determination for two reasons: (1) the amended version of section 5-214(b) of the Pension Code (40 ILCS 5/5-214(b) (West 2012)) retroactively applied to White's petition, and, therefore, White could not receive prior service credit for her previous employment with the office of the corporation counsel; and (2) White's position as a police aide for the City of Chicago police department did not constitute "investigative work" pursuant to section 5-214(c) of the Pension Code (40 ILCS 5/5-214(c) (West 2012)). We consider the Board's contentions in turn.

¶ 22                              Standard of Review

¶ 23   When a party appeals the circuit court's decision on a complaint for administrative review, we review the administrative decision rather than the circuit court's decision. *Esquivel v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 2011 IL App (1st) 111010, ¶ 18. There are three types of questions that a court may encounter on administrative review of an agency decision: questions of fact, questions of law, and mixed questions of law and fact. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008); *Collins v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 407 Ill. App. 3d 979, 983 (2011). Consequently, "The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005). The Administrative Review Law provides that judicial review of an administrative agency decision shall extend to all questions of law and fact presented by the entire record before the court. 735 ILCS 5/3-110 (West 2012). Further, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." *Id.* In examining an administrative agency's findings of fact, we do not weigh the evidence or substitute our judgment for that of the agency. *Cinkus*, 228 Ill. 2d at 210. "Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence." *Id.* In contrast, an agency's determination on a question of law is not binding on a reviewing court, and, thus, our review is independent and not deferential. *Id.* Alternatively, an examination of the legal effect of a given set of facts involves a mixed question of law and fact with a standard of review of clearly erroneous. *Id.* at 211.

¶ 24   In the present case, defendant asserts two arguments on appeal which require separate standards of review. The first is whether the Board properly applied the amended version of section 5-214(b) of the Pension Code retroactively to White's petition for pension service credit. This issue we review *de novo*, as it involves the meaning and effect of statutory provisions which is a question of law. *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 330 (2006).

¶ 25    The second argument concerns whether the Board correctly determined that White cannot receive prior service credit under either section 5-214(b) or section 5-214(c) of the Pension Code. These issues involve a mixed question of law and fact which we consider under the clearly erroneous standard of review. *Rosario v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 381 Ill. App. 3d 776, 780 (2008). "The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and as such, it grants some deference to the agency's decision." *Collins*, 407 Ill. App. 3d at 984. The Board's decision will be deemed clearly erroneous only where, upon review of the entire record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.* "Nonetheless, that the clearly erroneous standard is largely deferential does not mean, however, that a reviewing court must blindly defer to the agency's decision." *Esquivel*, 2011 IL App (1st) 111010, ¶ 20.

¶ 26                         The Retroactivity of Section 5-214(b)

¶ 27    We first turn to consider whether the Board properly applied the correct version of section 5-214(b) to White's petition. As previously discussed, we review the meaning and effect of statutory provisions *de novo*. *Allegis Realty Investors*, 223 Ill. 2d at 330. Illinois courts have adopted the approach set forth by the United States Supreme court in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), to determine when a statute is applied retroactively. As explained by our supreme court:

> "In *Commonwealth Edison*, this court for the first time adopted the United States Supreme Court's retroactivity analysis, as set forth in *Landgraf v. USI Film Products* [citation]. Under the *Landgraf* analysis, as adopted by this court, the first question is whether the legislature has clearly indicated the temporal reach of an amended statute. [Citation.] If so, then, absent a constitutional prohibition, that expression of legislative intent must be given effect. [Citation.] If not, then the court must determine whether applying the statute would have a retroactive impact, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. [Citation.] If there would be no retroactive impact, then the amended law may be applied retroactively. [Citation.] If there *would* be a retroactive impact, however, then the court must presume that the legislature did not intend that it be so applied. [Citation.]" (Emphasis in original.) *Caveney v. Bower*, 207 Ill. 2d 82, 91 (2003).

¶ 28    Accordingly, we first consider whether the legislature has clearly indicated the temporal, or retroactive, reach of the amended statute. *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 38 (2001) (citing *Landgraf*, 511 U.S. at 280). Our supreme court, however, has held that "in light of section 4 [of the Statute on Statutes (5 ILCS 70/4 (West 2006))], Illinois courts need never go beyond the threshold step of the *Landgraf* test. That is because the legislature will always have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes." *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 406 (2009).

¶ 29    Section 4, often referred to as the general savings clause of Illinois, provides:

> "No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense

or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding. If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect. This section shall extend to all repeals, either by express words or by implication, whether the repeal is in the act making any new provision upon the same subject or in any other act." 5 ILCS 70/4 (West 2012).

As our court has recognized, section 4 is a "clear legislative directive as to the temporal reach of statutory amendments and repeals when none is otherwise specified: those that are procedural may be applied retroactively, while those that are substantive may not." *Allegis Realty Investors*, 223 Ill. 2d at 331.

¶ 30    In the present case, Public Act 97-651 amended section 5-214(b) of the Pension Code effective January 5, 2012, by adding the following language noted in italics below:

"(b) As a temporary police officer in the city or while serving in the office of the mayor or in the office of the corporation counsel, as a member of the city counsel of the city, as an employee of the Policemen's Annuity and Benefit Fund created by this Article, as the head of an organization whose membership consists of members of the police department, the Public Vehicle License Commission and the board of election commissioners of the city, *provided that*, *in each of these cases and for all periods specified in this item (b), including those beginning before the effective date of this amendatory Act of the 97th General Assembly, the police officer is on leave and continues to remain in sworn status, subject to the professional standards of the public employer or those terms established in statute.*" 40 ILCS 5/5-214(b) (West 2012).

In a one-sentence statement, the Board asserts the amendment expressly provides that the amended section 5-214(b) be applied retroactively to White's petition. The Board does not explain its reasoning, but merely emphasizes the language of section 5-214(b) which states, "and for all periods specified in this item (b), including those beginning before the effective date of this amendatory Act." 40 ILCS 5/5-214(b) (West 2012). This one-sentence argument is unsupported by any specific facts, argument, or citation to authority in contravention of Illinois Supreme Court Rule 341 (eff. Feb. 6, 2013). Failing to cite to relevant facts and authority violates Rule 341 and results in the party forfeiting consideration of the issue. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Forfeiture, however, is a limit on the parties and not on the court. *Oshana v. FCL Builders, Inc.*, 2013 IL App (1st) 120851, ¶ 18. Accordingly, we will consider whether the amended version of the statute applied retroactively to White's claim.

¶ 31    We conclude the amended version of section 5-214(b) does not expressly prescribe that the legislature intended the amendment be applied to already pending petitions. Although section 5-214(b) states that it applies to applications seeking service credit for time periods prior to the amendment, it does not state that it applies to claims for prior service credit that were already pending before the amendment became effective. Typically, when the legislature intends for a statute to be given retroactive effect it includes language similar to " '[t]his Section applies to all causes of action that have accrued, will accrue, or are currently pending before a court of competent jurisdiction, including courts of review.' " *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 95 (2010) (quoting 425 ILCS 25/9f (West 2004)); see *Doe A.*, 234 Ill. 2d at 407 (finding the legislature clearly indicated when the relevant statute applied as the amendment

stated it applied "to actions pending when the changes took effect on July 24, 2003, as well as to 'actions commenced on or after that date' " (quoting 735 ILCS 5/13-202.2(e) (West 2006))). Express language identifying the temporal reach of the statute is absent from section 5-214(b); therefore, the legislature did not clearly express its intent for section 5-214(b) to be applied retroactively to pending petitions.

¶ 32    In the absence of an express provision regarding the temporal reach of section 5-214(b), we further examine whether the amendment is substantive or procedural in nature. If the amendment is substantive, it may not be retroactively applied. *Deicke Center–Marklund Children's Home v. Illinois Health Facilities Planning Board*, 389 Ill. App. 3d 300, 303 (2009). A substantive amendment "establishes, creates or defines rights," whereas "[p]rocedure is the machinery for carrying on the suit." (Internal quotation marks omitted.) *Id.* at 303-04; see *Doe v. University of Chicago*, 404 Ill. App. 3d 1006, 1012 (2010).

¶ 33    In the present case, the amendment is substantive in nature, as it serves to limit pension service credit to police officers who are "on leave and continue[ ] to remain in sworn status." 40 ILCS 5/5-214(b) (West 2012). The retroactive application of this amendment would prevent White from being eligible for prior service credit, despite filing her petition before the effective date of the amendment. Because the amendment is substantive in nature, the retroactive application of the amendment by the Board to White's claim was improper.

¶ 34                          Prior Service Credit Pursuant to Section 5-214(b)

¶ 35    The dissent, in determining whether White is eligible for prior service credit pursuant to the Pension Code, considered both the 2010 and 2012 versions of section 5-214(b). It should be noted, however, that the Board does not argue on appeal that White is not entitled to receive pension service credit under the 2010 version of section 5-214(b). In fact, during the administrative proceedings, the Board made no findings or determinations regarding whether White would be entitled to pension service credit if the original 2010 version of section 5-214(b) applied. As a result, no arguments were raised on appeal regarding whether White should or should not receive pension service credit under the 2010 version of the section. Furthermore, in the record there is no dispute White would be entitled to service credit under section 5-214(b) in effect prior to January 5, 2012. The focal point of contention through each phase of this litigation and on appeal has been the retroactive application of the amended 2012 version of section 5-214(b), not whether White is eligible under the 2010 version.

¶ 36    The dissent also raises the issue of White's employment as a legal investigator in the office of the corporation counsel. The dissent determines that this position is not the equivalent of a temporary police officer as the term is set forth in either the 2010 or the 2012 version of section 5-214(b). Whether or not White is eligible for pension service credit because of the type of position she held in the office of the corporation counsel was never an issue raised at any stage of this cause. As the circuit court noted, "[t]here is no dispute that the Record establishes that White served as an investigator in the office of the corporation counsel from November 1, 1985[,] to August 31, 1988." Although we review the determination of the Board and not that of the circuit court, it is evident from the trial court's statement that the capacity in which White served in the office of the corporation counsel was never an issue considered by the Board as a basis for denying White pension service credit. The issue has always been whether the Board erred in applying the amended version of section 5-214(b) retroactively to determine whether White was entitled to pension service credit. Accordingly, we remand the matter to the Board to determine whether White is entitled to pension service credit under section 5-214(b)

of the Pension Code (40 ILCS 5/5-214(b) (West 2010)).

¶ 37                         Prior Service Credit Pursuant to Section 5-214(c)

¶ 38     The Board contends that White failed to meet her burden of proof that she provided "investigative work" for the City of Chicago police department during her second period of employment as required by section 5-214(c) of the Pension Code. 40 ILCS 5/5-214(c) (West 2010).[3] The Board asserts White's duties amounted to taking down initial reports and then turning that report over to a sworn police officer who would then investigate the matter. The question of whether White's duties as a police aide constituted "investigative work" presents a mixed question of law and fact, which we review under the clearly erroneous standard. *Collins*, 407 Ill. App. 3d at 983.

¶ 39     Section 5-214(c) provides, in relevant part:

> "Any participant in this fund *** who has rendered service as a member of the police department of the city for a period of 3 years or more is entitled to credit for the various purposes of this Article for service rendered prior to becoming a member or subsequent thereto for the following periods:
>
> * * *
>
> (c) While performing safety or investigative work for the county in which such city is principally located or for the State of Illinois or for the federal government, on leave of absence from the department of police, or while performing investigative work for the department as a civilian employee of the department." 40 ILCS 5/5-214(c) (West 2010).

¶ 40     When construing a statute, this court's primary objective is to ascertain and give effect to the intent of the legislature. *Taiym v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 2014 IL App (1st) 123769, ¶ 14. To determine legislative intent, we look to the language of the statute, as it is the best indicator of the legislature's intent. *Id.* We must give the statutory language its plain, ordinary, and popularly understood meaning. *Id.* If a word or phrase within a statute is undefined, it is appropriate to employ a dictionary to ascertain the meaning of the undefined word or phrase. *Collins*, 407 Ill. App. 3d at 984-85.

¶ 41     Section 5-101 of the Pension Code provides that the policemen's annuity and benefit fund "shall be created and maintained for the benefit of its policemen, their widows and children, and of all contributors to, participants in, and beneficiaries of any police pension fund in operation, by authority of law, in such city immediately prior to the effective date." 40 ILCS 5/5-101 (West 2010). "The general assembly in passing the pension law endeavored to provide for the aged policemen who have served the city for a long period of time. *** It was adopted for a humane purpose and should be given a liberal construction." (Internal quotation marks omitted.) *Saffold v. City of Chicago*, 192 Ill. App. 3d 827, 830 (1989). Accordingly, "[t]he language of pension statutes must also be liberally construed in favor of the rights of the pensioner." *Shields v. Judges' Retirement System of Illinois*, 204 Ill. 2d 488, 494 (2003).

_____

[3]Based on our determination that the 2010 version of the Pension Code applies in this matter, we will utilize the 2010 version of section 5-214(c) in our consideration of White's claim. 40 ILCS 5/5-214(c) (West 2010). We note, however, that this section was not amended by Public Act 97-651 (eff. Jan. 5, 2012).

¶ 42    The parties rely on three cases involving the interpretation of section 5-214(c): *Collins*, 407 Ill. App. 3d 979; *Diedrich v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 381 Ill. App. 3d 305 (2008); and *Esquivel*, 2011 IL App (1st) 111010. The Board relies on *Collins*, asserting that White's duties as a police aide are similar to the duties the petitioner in *Collins* performed and, therefore, White does not qualify for prior service credit pursuant to section 5-214(c). Specifically, the Board asserts White's duties did not constitute "investigative work" as her job was only to write down preliminary information and pass it on to the sworn officers. White, however, relies on *Diedrich* and *Esquivel*. White asserts these cases are directly on point, as in each case the petitioners performed duties similar to White's and received prior service credit under section 5-214(c).

¶ 43    In *Collins*, we considered whether the petitioner, who had been previously employed as a police dispatcher aide, qualified for prior service credit under section 5-214(c) of the Code. *Collins*, 407 Ill. App. 3d at 980. The petitioner, Collins, presented evidence to the Board that established her duties were to write down information from 911 calls and pass that information on to the dispatcher. *Id.* at 986. Collins also solicited descriptive information such as the nature of the complaint and location of the incident and prepared radio dispatch cards. *Id.* Collins did not follow up with police officers in the investigation. *Id.* Although Collins asked the callers specific questions, those questions involved "preliminary information: What happened? What location? Where is the victim? Where is the offender?" *Id.*

¶ 44    The *Collins* court construed the word "investigate" to mean " 'to observe or study by close examination and systematic inquiry,' 'to make a systematic examination,' and 'to conduct an official inquiry.' " *Id.* at 985 (quoting Webster's Ninth New Collegiate Dictionary 636 (1985)). The reviewing court further defined "investigate" to mean " 'to inquire into (a matter) systematically; to make (a suspect) the subject of a criminal inquiry' and '[t]o make an official inquiry.' " *Id.* (quoting Black's Law Dictionary 830 (7th ed. 1999)).

¶ 45    We upheld the Board's determination that Collins' position as a police dispatcher aide did not constitute investigative work. *Id.* at 986. We reasoned that Collins' position as a police dispatcher aide did not require her to "make a systematic inquiry or examination to gather evidence of a crime; rather, she prepared an initial response card for police and on occasion fulfilled requests for name and license plate information or prepared requests for evidence technicians or police crime laboratory units to be sent to the scene of an emergency." *Id.* We further emphasized that Collins' position "was to transfer the information received from a 911 caller to the dispatcher, who would relay that information to the investigating police officers." *Id.*

¶ 46    In *Diedrich*, we considered whether the petitioner, a Chicago police officer, could receive prior service credit for work performed as a Spanish translator prior to becoming a police officer. *Diedrich*, 381 Ill. App. 3d at 306. In that case, the unrebutted evidence at the hearing demonstrated that Diedrich "would often be the first person to speak with Spanish-speaking civilians who came into the station." *Id.* at 307. Diedrich would "gather initial information and determine what action to recommend to the police officers." *Id.* Diedrich would also question the civilians to further elicit details of their complaints. *Id.* Additionally, Diedrich would make follow-up telephone calls to seek additional information on pending cases. *Id.*

¶ 47    Testimony was further elicited from other police officers, which established that as Diedrich became a more experienced translator, "she would initiate questions, without direct input from the police officer she was assisting." *Id.* One officer testified that "[n]o investigation involving a Spanish-speaking person could truly commence until a translator

- 11 -

such as petitioner first spoke with the individual." *Id.* at 308. Another officer testified that Diedrich "would not just translate what she was told to translate, she would formulate and ask questions on her own." *Id.*

¶ 48 We found that the Board omitted critical evidence regarding Diedrich's actual job duties in its written decision, which "included descriptions by the petitioner and police officers with whom she served regarding the manner in which her actual job duties exceeded those of a mere translator." *Id.* at 310. The *Diedrich* court concluded that "the plain and ordinary meaning of 'investigative work' includes the activities described by petitioner and four police officers in unrebutted testimony at the hearing before the Board." *Id.* at 312. The reviewing court further held "that petitioner has presented unrebutted evidence which satisfies the provisions of section 5-214(c)." *Id.* We specifically noted that Diedrich's duties entailed participation in "legal inquiries and the taking of evidence" and was "much more elaborate than mere translation." *Id.* at 310.

¶ 49 In *Esquivel*, we similarly considered whether Esquivel's position as a "civilian senior public safety aide/bilingual" qualified for prior service credit pursuant to section 5-214(c). *Esquivel*, 2011 IL App (1st) 111010, ¶ 1. In that case, the testimony established Esquivel worked at the desk of the 5th District police station and was in charge of the radios and the distribution of shotguns. *Id.* ¶ 6. Esquivel testified he would assist with station inquires and would be called to interpret for Spanish-speaking individuals. *Id.* Esquivel further assisted police officers after an initial arrest, including "giving *Miranda* rights, questioning, informing the individual of the bond, and letting the individual know the court date." *Id.* Esquivel also testified he would "help an officer in contacting victims of 'con games' or 'purse snatchings.' He would try to get a description of the individuals and any other information for senior officers to investigate." *Id.* ¶ 7. He testified this information "helped the officers to set up 'stings' at currency exchanges." *Id.*

¶ 50 Other officers either testified at the hearing before the Board or submitted letters in support of Esquivel's application. *Id.* ¶¶ 8-13. The officers testified consistently with Esquivel's testimony, with one stating that he would use Esquivel to " 'pull[ ] out of the victim what happened to them so we could write our paper up.' " *Id.* ¶ 8. A letter from an officer in support of Esquivel's petition stated, " 'Officer Esquivel also initiated his own questioning that proved vital of [*sic*] the case.' " *Id.* ¶ 11. Another letter stated that Esquivel " 'became incredibly knowledgeable in his investigative skills and the district officers considered him their peer.' " *Id.* ¶ 13. The Board denied Esquivel's request for prior service credit, concluding that his work did not constitute investigative work. *Id.* ¶ 14. The circuit court reversed the Board's decision. *Id.* ¶ 15.

¶ 51 On appeal, we found the Board's determination to be clearly erroneous as the "evidence presented to the Board demonstrates that Esquivel did more than 'act as an interpreter and to hand out when needed, radios and shotguns to officers assigned to various tasks.' " *Id.* ¶ 35. We stated that Esquivel "helped to conduct official inquires by assisting in the questioning of victims and arrestees." *Id.* The testimony established that Esquivel "was able to initiate questions" and that his translation work "helped officers to set up sting operations and, on at least one occasion, to obtain a search warrant." *Id.*

¶ 52 Based on the evidence presented, including White's testimony and the affidavit of Officer Maxwell, we find the instant case to be closer to *Diedrich* and *Esquivel* than *Collins*. Here, the record demonstrates that White presented her own testimony to the Board, as well as an affidavit from Officer Maxwell, which established her duties entailed investigative work

within the meaning of section 5-214(c). Specifically, White testified she would take civilian complaints and "formulate a detailed list of questions" in order to "help resolve [the] situation." Part of White's duties also involved the identification of issues that needed immediate attention, and in those cases she would "give a flash message over the radio" or call an ambulance for assistance.

¶ 53    In addition, White's testimony regarding the discovery of the dog-fighting ring further established that her duties as a police aide entailed more than just passing information along to other officers, but in fact consisted of "investigative work" as contemplated by section 5-214(c). White testified that after a civilian came into the police station with a complaint of about five or six dogs barking, she formulated a series of detailed follow-up questions and, based on the responses to those questions, determined an illegal dog-fighting ring may be operating in the location of the complaint. Based on White's investigative work, an illegal dog-fighting ring was in fact discovered and weapons were recovered. In addition, in each situation, White would formulate questions that would lead to the resolution of the citizen's complaint. White's actions clearly involved a " 'close examination and systematic inquiry' " and, therefore, constituted "investigative work" under section 5-214(c). *Collins*, 407 Ill. App. 3d at 985 (quoting Webster's Ninth New Collegiate Dictionary 636 (1985)).

¶ 54    Moreover, as noted by the circuit court, the Board based its determination to deny White pension service credit for her employment as a police aide because, "White obtained and wrote down information from a citizen or officer and passed that information on to others to investigate. White took no part in any follow up [*sic*] investigation." The decisions of *Esquivel* and *Diedrich*, as discussed above, establish that conducting the follow-up portion of an investigation is not determinative of whether an individual has performed "investigative work" under section 5-214(c). These decisions set forth that the facts surrounding the "participa[tion] in legal inquiries and the taking of evidence" by a petitioner are what establish whether a petitioner has conducted "investigative work" so as to receive prior service credit pursuant to section 5-214(c). *Diedrich*, 381 Ill. App. 3d at 310; see *Esquivel*, 2011 IL App (1st) 111010, ¶ 35.

¶ 55    The dissent's interpretation of what transpired at the hearing before the Board does not take into consideration the fact that the Board declined to consider Officer Maxwell's affidavit and made no finding as to his credibility. Moreover, the dissent does not take into account the fact that White was never allowed to complete her testimony. We acknowledge that an administrative hearing is not as strictly structured as a hearing in the circuit court; however, parties in administrative hearings are still entitled to due process of law. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92-93 (1992). "A fair trial before a fair tribunal is a basic requirement of due process, a requirement that applies to both courts and administrative agencies which perform adjudicatory functions." *Arvia v. Madigan*, 209 Ill. 2d 520, 540 (2004). It is well settled that a "fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Abrahamson*, 153 Ill. 2d at 95. Here, White was not permitted to complete her testimony by a member of the Board. In addition, the Board declined to consider the affidavit of Officer Maxwell because "there was no showing made as to why the officer could not be present and be examined as to the affidavit made and his credibility." The record demonstrates, however, that both Officer Maxwell's affidavit and the representations of White's counsel established that Officer Maxwell was absent because he was at work at the time of the hearing. We note that Officer Maxwell's affidavit was dated March 26, 2012, three

- 13 -

days before the hearing occurred, and was signed and sworn by him before a notary. The Board's decision to disregard the affidavit "minimized the unrebutted evidence presented" regarding White's claim as a civilian employee. *Esquivel*, 2011 IL App (1st) 111010, ¶ 30.

¶ 56    We find that the Board's decision was clearly erroneous, and based on the entire record, we are left with the definite and firm conviction that a mistake has been committed. White presented sufficient evidence to satisfy the requirements of section 5-214(c) and should be awarded the applicable pension service credit.

¶ 57                                    CONCLUSION

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County and remand this matter to the Board for a determination of the pension service credit for which White is entitled.

¶ 59    Affirmed and remanded with directions.

¶ 60    JUSTICE LAMPKIN, dissenting.

¶ 61    I dissent from the majority's conclusion that White is entitled to pension service credit under section 5-214(b) and (c) of the Pension Code (40 ILCS 5/5-214(b), (c) (West 2010)). First, I would find that White's employment as a legal investigator of tort and personal injury actions for the office of the corporation counsel does not qualify for service credit under either the 2010 or 2012 version of section 5-214(b) because she was not a temporary police officer while serving in the office of the corporation counsel. Second, I would find that White's employment as an administrative assistant II/police aide for the City of Chicago police department does not qualify for service credit under section 5-214(c) because her duties did not constitute investigative work.

¶ 62    When this court reviews a final decision under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2010)), we review the decision of the administrative agency and not the circuit court's determination. *Rosario*, 381 Ill. App. 3d at 779-80. The issue of White's eligibility for service credit under section 5-214(b) involves interpretation of the statute, which is a question of law subject to *de novo* review. *City of Sandwich v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 1006, 1008 (2011). However, even where review is *de novo*, this court may afford the Board's construction of the relevant provisions of the Pension Code some "deference in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise and serve as an informed source for ascertaining the legislature's intent." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 n.9 (2010). Reviewing courts may give substantial weight and deference to an interpretation by the agency charged with the administration and enforcement of the statute only if the statute is ambiguous. See *Abrahamson*, 153 Ill. 2d at 97-98; *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983). Nevertheless, an agency's interpretation is not binding on the court and will be rejected when it is erroneous. *Shields*, 204 Ill. 2d at 492.

¶ 63    The General Assembly passed the pension law to provide for the aged police officers who had served the city for a long period of time. *Saffold v. City of Chicago*, 192 Ill. App. 3d 827, 830 (1989). The reviewing court must construe the provisions of the Pension Code liberally in favor of the rights of the pensioner. *Johnson v. Retirement Board of the Policemen's Annuity &*

*Benefit Fund*, 114 Ill. 2d 518, 521 (1986). The primary rule of statutory interpretation, "to which all other canons and rules are subordinate, is to ascertain and give effect to the intent of the legislature." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 509-10 (2007). "The language of a statute is generally considered to be the most reliable indication of the legislature's objectives in enacting that particular law." *Id*. at 511. "[A]ll words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation." *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Id*.

¶ 64        Section 5-214(b) provides in relevant part as follows:

"§ 5-214. Credit for other service. Any participant in this fund (other than a member of the fire department of the city) who has rendered service as a member of the police department of the city for a period of 3 years or more is entitled to credit for the various purposes of this Article for service rendered prior to becoming a member or subsequent thereto for the following periods:

\*\*\*

(b) As a temporary police officer in the city or while serving in the office of the mayor or in the office of the corporation counsel, as a member of the city council of the city, as an employee of the Policemen's Annuity and Benefit Fund created by this Article, as the head of an organization whose membership consists of members of the police department, the Public Vehicle License Commission and the board of the election commissioners of the city, *provided that, in each of these cases and for all periods specified in this item (b), including those beginning before the effective date of this amendatory Act of the 97th General Assembly, the police officer is on leave and continues to remain in sworn status, subject to the professional standards of the public employer or those terms established in statute*." (Emphasis added.) 40 ILCS 5/5-214 (West 2012).

Except for the above-quoted italicized language, which was added by Public Act 97-651 and became effective January 5, 2012, the relevant provisions of 5-214(b) were the same under the 2010 or 2012 versions of the statute. Also applicable in this case is section 5-109 of the Pension Code, which defines *policeman* as:

"(a) An employee in the regularly constituted police department of a city appointed and sworn or designated by law as a peace officer with the title of policeman, policewoman, chief surgeon, police surgeon, police dog catcher, police kennelman, police matron, and members of the police force of the police department; and

(b) An employee as defined in sub-paragraph (a) immediately above who is serving in the regularly constituted police department of a city in a rank or position which is exempt from civil service and who, immediately prior to the time he began such service, was a participant in the Policemen's Annuity and Benefit Fund Act; and

(c) Any policeman of a park district transferred to the employment of a city under the 'Exchange of Functions Act of 1957.' " 40 ILCS 5/5-109 (West 2010).

¶ 65        White argues that she is entitled to service credit under section 5-214(b) because, prior to becoming a police officer, she was "serving in the office of the corporation counsel" when she was employed full time as a legal investigator in the office of the corporation counsel. Essentially, White's interpretation of section 5-214(b) seems to be that there are six situations in which an officer could receive pension credit for prior employment: (1) as a temporary

police officer in the city; (2) as someone serving in the office of the mayor; (3) as someone serving in the office of the corporation counsel; (4) as a member of the city council; (5) as an employee of the Policemen's Annuity and Benefit Fund (Policemen's Fund); and (6) as the head of an organization whose membership consists of members of the police department, the Public Vehicle License Commission and the board of election commissioners of the city. The Board does not seem to dispute White's interpretation of section 5-214(b).

¶ 66    I, however, do not read section 5-214(b) to give service credit to any person serving in the corporation counsel's office. While it could be argued that subparagraph (b) is ambiguous and can be read according to White's interpretation, I believe such ambiguity is dispelled by the punctuation and parallelism of the four clauses that comprise subparagraph (b). Subparagraph (b) lists four separate categories for which a fund participant may receive service credit. Each clause is introduced by the phrase "as a" and is separated by commas. Moreover, each clause designates a particular type or status of employment, *i.e.*, "a temporary police officer," a "member," an "employee" or "the head."

¶ 67    Consequently, I read subparagraph (b) to provide service credit when a fund participant has rendered service: (1) as a temporary police officer in the city or while serving in the office of the mayor or the corporation counsel; (2) as a member of the city council; (3) as an employee of the Policemen's Fund; or (4) as the head of an organization consisting of members of the police department, the Public Vehicle License Commission and the city's board of election commissioners. I would not construe the first clause to grant service credit to any employee or volunteer of the mayor's office or the corporation counsel's office. If the legislature had meant to include those types of employees in the service credit provision of subparagraph (b), specific language to that effect would have been included in the subparagraph.

¶ 68    In order for White's work at the corporation counsel's office to qualify for service credit under subparagraph (b), she had to be a temporary police officer while serving at that office. She was not. Therefore, I would hold that the clear language of the statute establishes that White is not entitled to service credit for her employment as a legal investigator at the corporation counsel's office prior to her employment with the city department of police.

¶ 69    Next, White contends she is entitled to service credit under section 5-214(c) of the Pension Code because, when she was an administrative assistant II/police aide for the City of Chicago police department, she was "performing investigative work for the department as a civilian employee of the department." 40 ILCS 5/5-214(c) (West 2010). I would find that the Board's determination was not clearly erroneous where the Board concluded that White did not qualify for pension credit under section 5-214(c) because she did not show that her prior civilian employment duties were investigative.

¶ 70    According to her testimony, White assisted citizens who came to the police station seeking police service or help. She was stationed at the front desk and wore a uniform that was similar to the uniforms worn by sworn police officers. She questioned the people seeking assistance and would formulate follow-up questions based on their responses. Then she would give that information to police officers or detectives. She acknowledged that she did not participate in any ensuing investigations conducted by the officers or detectives. If the situation required an immediate response, she would give a flash message over the police radio. On one occasion, a man complained about barking dogs. When White questioned the man further, she suspected that illegal dog-fighting was taking place and forwarded that information to the detective division, which confirmed her suspicions, broke up the dog-fighting ring, and recovered guns and other contraband. On another occasion, a mother came to the station with a small child,

- 16 -

who was frightened, hysterical, and in pain. White questioned the mother, concluded there was something physically wrong with the child and summoned an ambulance. It was later determined that the child had been sexually assaulted.

¶ 71    White also submitted the affidavit of Richard Maxwell, who averred that he was a "lifetime law enforcement officer in the Chicago Police Department" and had "personal knowledge" of White's job duties from 1995 until 1998. Maxwell stated that White's duties included conducting preliminary investigations by questioning the people who came to the police station, writing confidential reports, interviewing victims and witnesses, running name checks of persons taken into custody to determine if they were wanted on a warrant, and searching female arrestees for weapons and contraband. Maxwell opined that the duties White performed were investigative duties. Maxwell stated that he could not be present for White's hearing because he had to work.

¶ 72    Contrary to the majority's conclusion, I would find that the facts of this case are closer to *Collins*, 407 Ill. App. 3d 979, which held that the applicant's duties were not investigative, than to *Diedrich*, 381 Ill. App. 3d 305, and *Esquivel*, 2011 IL App (1st) 111010, which held that the applicant's duties were investigative.

¶ 73    In *Collins*, the applicant received 911 telephone calls and questioned the callers to determine the appropriate police resources needed. She also translated Spanish-speaking 911 calls to English and elicited descriptive information such as the nature of the complaint and location of the incident. She did not go outside on the street with other police officers as part of her job function. *Collins*, 407 Ill. App. 3d at 981. Similarly, White questioned people who came to the police station for assistance in order to determine the appropriate resources or course of action relevant to their complaint or request. Although White formulated the questions she asked, she was eliciting descriptive information in order to determine what police services might be warranted and then gave that information to police officers or detectives, who would conduct the police investigation. White did not accompany the police as they conducted the investigation and did not further participate in the investigation. Her thorough and competent performance of her police aide job did ultimately result in investigative police activity that stopped a dog-fighting operation and obtained help for a sexually assaulted child, but White's laudable job performance did not elevate her job duties to investigative work.

¶ 74    White's job duties were not similar to duties deemed investigative by this court in *Diedrich* and *Esquivel*. The applicant in *Diedrich* had been a civilian Spanish translator for the police department since 1972 before she became a police officer in 1986. There were very few Spanish-speaking police officers in the district at that time, and Diedrich's main function was interpreting at the police station both in person and on the telephone. *Diedrich*, 381 Ill. App. 3d at 306-07. This court, however, concluded that she engaged in much more elaborate work than mere translation because she participated in legal inquiries and the taking of evidence. *Id*. at 310. Specifically, due to the language barrier, she directly participated in investigations by assisting the officers during the questioning of victims and offenders. When the investigating officer did not ask questions germane to the situation, Diedrich questioned citizens on her own accord, evaluated whether they were unsure or evasive in their answers, evaluated their credibility and forthrightness, and communicated her evaluation to the police officer. *Id*. at 306-08. Diedrich also undertook duties that entailed follow-up telephone calls to seek additional information on pending cases. *Id*. at 307. In addition, Diedrich spent approximately two months a year substituting for police officers on vacation in the review office. *Id*. In that

- 17 -

role, she examined confidential case reports to determine whether patterns existed which indicated that an offender might have been involved in more than one crime. *Id*. She would then submit written reports of her conclusions to the department. *Id*.

¶ 75 The applicant in *Esquivel* was a civilian employee in the police department in 1974 until he entered the police academy in 1989. *Esquivel*, 2011 IL App (1st) 111010, ¶ 2. He sought service credit for his work beginning in 1980 as a senior public safety aide/bilingual. *Id*. ¶ 3. His duties included speaking in front of community groups to explain the "con games" that were being perpetrated on elderly citizens and to address safety issues and crime prevention. *Id*. ¶¶ 3, 5. Esquivel helped build a good relationship between the community and the police during community meetings because Hispanic people who might not want to talk directly to the police would tell Esquivel about problems, and Esquivel would relay that information to an officer and assist in the investigations that ensued. *Id*. ¶¶ 9, 12. Information that he received from safety workshops helped the officers set up "stings" at currency exchanges, and his translation of a couple of letters resulted in warrants for drug houses. *Id*. ¶ 31. There were very few Hispanic officers when Esquivel was hired, and he assisted as a translator with station inquiries and would be called to interpret for Spanish-speaking individuals and for police officers after an initial arrest. *Id*. ¶¶ 5-6. He also "assisted in giving *Miranda* rights, questioning, informing the individual of the bond," and was subpoenaed multiple times to testify about the giving of *Miranda* rights. *Id*. ¶ 6. A police captain testified that he used Esquivel to translate for victims and arrestees during investigations, and would have Esquivel ask some questions for the officers after an offender was advised of his rights. *Id*. ¶ 8. If Esquivel was not available to assist with the translations, it delayed investigations considerably. *Id*. ¶¶ 8, 11. Esquivel assisted in the processing of arrestees and, being a civilian employee, would gain an arrestee's confidence and learn additional information that would then be conveyed to the arresting officer. *Id*. ¶ 13. One officer noted that Esquivel " 'became incredibly knowledgeable in his investigative skills and the district officers considered him their peer.' " *Id*.

¶ 76 Due to a language barrier, both Diedrich and Esquivel participated in and assisted police officers with the questioning of victims, suspects, and arrestees during the investigation process. Through their testimony and the testimony of their colleagues and superiors, Diedrich and Esquivel established that they went beyond their roles as translators and actively participated in investigations with the officers. White, however, did not participate in or help conduct police inquiries by assisting in the questioning of victims and arrestees with the police officers. She acknowledged that after she obtained preliminary information from a member of the public and conveyed that person's complaint or request to an officer or a detective, she had no further role in the investigations that ensued.

¶ 77 Finally, White contends her testimony was persuasive because it was unrebutted and argues that the Board wrongly rejected Officer Maxwell's affidavit testimony. I disagree. First, the determining factor here was the *substance* of White's testimony and the evidence concerning her duties as a police aide, not the unrebutted nature of her testimony. Moreover, I disagree with the notion that White was not allowed to complete her testimony. When she testified about the dog-fighting incident, the Board asked her if she had any documentation to support her assertion that her preliminary inquiries resulted in the recovery of guns and other contraband and the disruption of an illegal dog-fighting ring. White admitted that she had no corroborating testimony or evidence. When she testified about the sexually assaulted child, the Board indicated that it did not need to hear any further testimony about incidents where White

- 18 -

obtained preliminary information from members of the public seeking police assistance and then passed that information on to police officers or detectives who conducted the investigations. Aside from submitting Officer Maxwell's affidavit, White did not tell the Board at the hearing that she had additional relevant testimony or evidence to offer, and she does not specify on appeal any further evidence she would have offered at the hearing. According to the record, White continued to talk about her prior role as a civilian employee in the police department, and the Board politely thanked her for her work before adjourning to consider the evidence.

¶ 78    Second, the Board acted well within its authority to determine what weight, if any, to give Officer Maxwell's affidavit. Officer Maxwell's credibility was an issue, and the Board cannot cross-examine an affidavit. Furthermore, Officer Maxwell failed to explain why he was unable to obtain time off from work in order to testify at the scheduled hearing on this important matter involving White's claim for approximately 10 years of pension service credit. Although the applicant in *Esquivel* submitted into evidence letters from one police captain and two police officers who had worked with Esquivel in support of his application for service credit, the Captain and one of the two officers also testified in person at Esquivel's hearing. White's failure to present any witness aside from herself left the Board with no corroborating testimony subject to cross-examination on the crucial issue of the alleged investigative nature of her job duties. Furthermore, Officer Maxwell's opinion in his affidavit that White's duties were investigative was not strongly supported with specific facts, and he did not indicate how frequently he worked with White or whether he was her supervisor or simply a coworker.

¶ 79    I believe the Board's conclusion–that White's duties as a police aide did not constitute investigative work–was not clearly erroneous. White simply questioned people who came to the station for assistance in order to obtain preliminary information, which she then passed on to police officers or detectives who would conduct the investigation. She neither participated with the officers as they conducted the investigation nor made a systematic inquiry or examination to gather evidence of a crime.